Filed 4/2/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DEAN GRAFILO, as Director, etc., | B287080 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BS171234) |
| MARC DAVID WOLFSOHN, | |
| Defendant and Appellant; | |
| KIMBERLY KIRCHMEYER, as Executive Director, etc., | |
| Real Party in Interest and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Howard L. Halm, Judge. Reversed.

Bonne, Bridges, Mueller, O'Keefe & Nichols, and Joel Bruce Douglas for Defendant and Appellant.

Xavier Becerra, Attorney General, Gloria L. Castro, Assistant Attorney General, Judith T. Alvarado, and Christine R. Friar, Deputy Attorneys General, for Plaintiff and Respondent Dean Grafilo, Director of the Department of Consumer Affairs, and Real Party in Interest and Respondent Kimberly Kirchmeyer, Executive Director of the Medical Board of California.

Marc David Wolfsohn, M.D., appeals from an order compelling him to produce the medical records of five of his patients pursuant to a subpoena issued by an investigator with the Medical Board of California (Medical Board), a unit of the Department of Consumer Affairs (DCA). We agree with Wolfsohn that the DCA did not establish good cause for the subpoena and, therefore, reverse.

## FACTUAL AND PROCEDURAL SUMMARY

### A.  *Background*

Wolfsohn is a physician specializing in pain management. He has been licensed by the Medical Board to practice medicine since 1977.

In December 2014, the Medical Board received a report from a law enforcement officer that Wolfsohn may be overprescribing controlled substances to patients. The Medical Board opened an investigation and obtained from the Controlled Substance Utilization Review and Evaluation System[1] ("CURES") a report of Wolfsohn's history of prescribing controlled substances for the period between January 30, 2014 and January 30, 2015.

Dr. Shoaib Naqvi is a medical consultant for the DCA with the "responsibility to maintain familiarity with the standard of medical practice in the State of California." Naqvi reviewed the CURES report and identified five patients (J.A., R.G., V.J., J.R. and V.H.; collectively, the patients) to whom, in Naqvi's opinion,

---

[1] CURES is a prescription drug monitoring program that includes information regarding prescriptions for certain controlled substances. (Health & Saf. Code, § 11165, subds. (a) & (d); *Lewis v. Superior Court* (2017) 3 Cal.5th 561, 565 (*Lewis*).)

Wolfsohn "prescribed controlled substances in a manner that appeared to be inconsistent with the standard of care for prescribing those drugs." According to Naqvi, the "only way to determine whether Wolfsohn properly and safely administered any of these controlled substances to the five patients . . . is to obtain and review the complete and accurate medical records of the five patients."

In early September 2016, the DCA issued and served on Wolfsohn an investigational subpoena duces tecum pursuant to Government Code section 11181. The subpoena commanded Wolfsohn to produce "the complete medical record" for each of the patients for the period January 1, 2014 through March 31, 2016. The document production was set to take place before DCA investigator Tracy Tu on September 26, 2016. It does not appear from our record that the DCA provided a copy of the subpoena to the patients or otherwise notified them that it was seeking their medical records from Wolfsohn prior to the stated production date.

On September 20, 2016, Wolfsohn's attorney delivered a letter to Tu stating, "[W]e contacted the patients," who "confirmed that they do not want [Tu] or the Medical Board to have access to their confidential medical information." Accordingly, Wolfsohn would "refuse to comply with the subpoena duces tecum and assert [the patients'] constitutional privacy rights and statutory privilege under the doctor/patient privilege, if not the psychotherapist/patient privilege."

Wolfsohn did not appear or produce the requested medical records pursuant to the subpoena.

About five months later, on February 23, 2017, Medical Board investigator Tu sent by regular and certified mail a letter to the patients stating that the DCA's division of investigation "is attempting to obtain your medical records from Marc

3

Wolfsohn, M.D. via service of a subpoena" (capitalization omitted) that "was served on 09/09/16 compelling the production of your records by 09/26/16.  [¶]  If you have an objection to the use of your records in this process, you may wish to consult an attorney to discuss your options."

Enclosed with the letter is a copy of the subpoena served on Wolfsohn and a document titled "Notice to Medical Consumers." (Capitalization omitted.)  This document describes the investigatory role of the DCA's division of investigation, and states that DCA "[i]nvestigators and medical consultants read and evaluate the medical records of patients who were treated by those whose practices have come under question."  Although "patient records are kept confidential . . . during the investigation," the "records may become part of the official proceeding record. . . . [¶] If you have an objection to the use of your records in this process, you may wish to consult an attorney to discuss your options."

On March 12, 2017, Wolfsohn's attorney sent a letter to Tu stating that V.H., who had previously objected to the request for her medical records, "continues to protest this unwarranted intrusion into her privacy."  Our record does not reveal whether any other patients received the DCA's letter or whether the DCA undertook other efforts to notify the patients.

B.    *DCA's Petition to Compel Compliance with Subpoena*

On October 30, 2017, the Attorney General, on behalf of the DCA, filed a petition in Los Angeles County Superior Court for an order compelling Wolfsohn to comply with the subpoena. The petition names Wolfsohn as the sole respondent and names Kimberly Kirchmeyer, in her capacity as the executive director of the Medical Board, as the real party in interest.

4

The petition was supported by Naqvi's declaration. Naqvi described generally the various statutory classes, or schedules, of controlled substances (see Health & Saf. Code, §§ 11054–11058); referred to a measurement known as "morphine equivalent dosing" (MED), which is used to compare different pain relieving drugs; and, with respect to particular drugs, identified the drug's class, its use in treatment, and its potential adverse consequences.

Naqvi also opined as to actions physicians must take to comply with the standard of care when prescribing controlled substances. These include conducting an appropriate examination of the patient, documenting the diagnosis underlying the prescription, obtaining informed consent regarding potential risks (which Naqvi stated is required when the MED value exceeds 100), and evaluating "any co-morbid conditions that could be worsened by the use of [the] drug."

According to Naqvi, the CURES report for Wolfsohn revealed that each of the patients whose records are sought in the subpoena, had "prescription patterns that, in the absence of any other information, appear to represent concerning departures from the standard of care for prescribing these controlled substances." He described the drugs that (according to the CURES report) Wolfsohn prescribed to each patient, the amount of each prescribed drug, and the frequency of the prescriptions fulfilled. Based on this data, he estimated a range of MED values for the patients ranging from 80 to 300.[2]

Naqvi does not opine that the data or the MED level indicated by the CURES report constitutes a violation of the Medical

[2] The DCA did not offer the CURES report in support of its petition and it is not included in our record.

5

Practices Act or breaches a standard of care. Rather, as to each patient, he states: A "review of [the] patient['s] medical record is necessary to confirm that an appropriate examination or screening was done before . . . Wolfsohn prescribed this medication regimen, and also to determine whether regular assessments of the efficacy and effects of the treatment regimen were not only conducted but documented, and that the appropriate monitoring measures were performed. If . . . Wolfsohn failed to properly screen and subsequently monitor [the patient] while prescribing these medications, his care may be found to fall below the standard of care, violate the Medical Practice Act and place his patients at undue risk."

On November 2, 2017, the DCA served Wolfsohn's counsel with notice of a hearing on the petition for December 5, 2017. The DCA did not serve the notice or the petition on any of the patients.

On November 17, 2017, Wolfsohn's attorney served a subpoena duces tecum on Naqvi and a notice of taking his deposition. Three days later, the Attorney General, as counsel for Naqvi, served objections to the deposition notice. Naqvi did not appear for his deposition. When Wolfsohn subsequently applied for an order setting a hearing on a motion to compel the deposition, the court denied the application, stating that the deposition "would not be appropriate at this phase," where the DCA is merely petitioning to enforce an investigational subpoena.

On December 5, 2017, at the hearing on the DCA's petition, the court issued an order to Wolfsohn to show cause why he "has not attended and testified or produced the records as requested by [DCA]." The court set a hearing on the order to show cause for December 13. The court also ordered the DCA to give notice of the hearing to the patients, but did not specify the manner of notice or a deadline for doing so.

6

On December 12, 2017, Wolfsohn filed objections to the DCA's evidence and an opposition to the petition. He also filed a declaration by Dr. Standiford Helm, a physician specializing in pain management.[3] Helm criticizes Navqi's methodology, his understanding of the standard of care for physicians specializing in pain management, and his opinions. The prescriptions reflected in the CURES report, Helm stated, are "not outside of acceptable prescribing by a seasoned [b]oard certified pain management specialist." Helm concludes that there is no reason to believe that the patients "were receiving substandard care or being prescribed substances by . . . Wolfsohn outside acceptable standards of care." Navqi's desire to review the patients' medical records, Helm adds, is "speculative curiosity, not a good cause belief to pry into confidential patient files and care." Helm further observed that Medical Board subpoenas such as the one issued in this case may have a "chilling effect[]" on physicians' treatment of patients experiencing pain, which "harms the public good" and "undermines the doctor-patient alliance, and patient confidence and candor."

On the same day, counsel for the patients filed a "notice of special appearance" (capitalization omitted), stating that they "object to these proceedings on the ground that this [c]ourt lacks jurisdiction over these patients and this [c]ourt is now proceeding without according adequate due process of law. These patients hereby further object based on their constitutional right to privacy,

---

[3] The DCA objected to Wolfsohn's opposition papers on the ground they were untimely. The court overruled the objection and considered the opposition papers.

the Pain Patient Bill of Rights, equal protection of law, the doctor-patient privilege, and the psychotherapist-patient privilege."[4]

At the December 13 hearing, counsel for the patients reiterated their objections and requested "more time to review the papers and to have an opportunity to formally respond." Although the court acknowledged that "it would be helpful [to] have declarations from [the patients]," it denied counsel's request. After hearing argument, the court granted the petition, finding that the DCA "has a compelling interest that outweighs any privacy interest of either [Wolfsohn] or his patients." The court did not rule on Wolfsohn's objections to the DCA's evidence.

After the hearing, counsel for the patients filed a declaration stating that the patients had not received a copy of the petition and reasserted their objections to the proceedings on the ground, among others, that they received inadequate notice of the proceeding and the disclosure of their medical records violates their right to privacy. In the minute order reflecting the court's order granting the petition, the court added: "Post-ruling note: Court will read and consider declaration of attorney [for the patients], filed after hearing."

Wolfsohn timely appealed.

## DISCUSSION

Wolfsohn contends: (1) The court did not have jurisdiction to enforce the subpoena because the patients were not parties to the proceeding; (2) The DCA failed to provide the patients with proper

---

[4] The Pain Patient Bill of Rights provides that a "patient who suffers from severe chronic intractable pain has the option to request or reject the use of any or all modalities in order to relieve his or her pain." (Health & Saf. Code, § 124961, subd. (a).)

8

or adequate notice of the subpoena; (3) By seeking the patients' "complete medical records," the subpoena was drawn too broadly; (4) The court erred by refusing to permit him to take the deposition of Naqvi; and (5) The subpoena was not supported by competent evidence of good cause. We address the good cause issue first and, because our conclusion is dispositive, do not reach the remaining issues.

### A. *Medical Board Investigations and Subpoena Power*

The Medical Board, a unit of the DCA, is "charged with the duty to protect the public against incompetent, impaired, or negligent physicians." (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 7.) Among other duties, it reviews "the quality of medical practice carried out by physician[s]" and enforces "the disciplinary and criminal provisions of the Medical Practice Act." (Bus. & Prof. Code, § 2004, subds. (a) & (e).) It is authorized to investigate complaints that a physician may be guilty of "unprofessional conduct," which includes "[r]epeated acts of clearly excessive prescribing . . . of drugs," and prescribing prescription drugs "without an appropriate prior examination and a medical indication." (Bus. & Prof. Code, §§ 725, subd. (a), 2234, 2242, subd. (a); see *Cross v. Superior Court* (2017) 11 Cal.App.5th 305, 311 (*Cross*).)

In connection with a Medical Board investigation, the DCA's investigators may "[i]ssue subpoenas for the attendance of witnesses and the production of . . . documents . . . and testimony pertinent or material to any inquiry, investigation, hearing, proceeding, or action." (Gov. Code, § 11181, subd. (e); see *Lewis*,

*supra*, 3 Cal.5th at p. 567.)[5]  Subpoenas may be issued "for purely investigative purposes; it is not necessary that a formal accusation be on file or a formal adjudicative hearing be pending." (*Arnett v. Dal Cielo, supra,* 14 Cal.4th at p. 8.)  The subpoenas must, however, be issued "in a manner consistent with the California Constitution and the United States Constitution."  (Gov. Code, § 11184, subd. (a).)  As discussed below, when information about a patient's medical record is sought, California's constitutional right to privacy places procedural and substantive limits on the DCA's subpoena power.

If a subpoenaed person does not comply with a subpoena, the DCA may petition the superior court "for an order compelling the person to . . . attend and testify or produce and permit the inspection and copying of the papers or other items required by the subpoena."  (Gov. Code, § 11187, subd. (a).)  Government Code section 11187 sets forth the particular requirements of the petition.

Upon the filing of a petition under Government Code section 11187, the court shall issue an order directing the subpoenaed person to show cause why he or she has not complied with the subpoena.  (Gov. Code, § 11188.)  At the hearing on the order to show cause, the court shall determine the validity of any objections to the subpoena.  (*Id.*, § 11187, subd. (d).)  "If it appears to the court that the subpoena was regularly issued," the court shall order that

---

[5]  Under Government Code section 11181, the subpoena power is held by "the department head."  That person "may delegate the powers conferred upon him [or her] . . . to any officer of the department he [or she] authorizes to conduct the investigation." (Gov. Code, § 11182.)  Wolfsohn does not dispute that the person issuing the subpoena in this case had the authority to issue the subpoena.

the person appear and produce the required documents at a certain time.  (*Id.*, § 11188.)

## B.  *The Patients' Privacy Rights*

The California Constitution guarantees to individuals the right of "privacy."  (Cal. Const., art. I, § 1; *Lewis*, *supra*, 3 Cal.5th at p. 569.)  The provision's "central concern" is the "[p]rotection of informational privacy" (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 552 (*Williams*)); that is, the interest "in precluding the dissemination or misuse of sensitive and confidential information" (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 35 (*Hill*)).[6]

The DCA does not dispute that Wolfsohn's patients have a right to privacy with respect to information contained in the requested medical records.  Indeed, that right is well-settled.  (See *Hill*, *supra*, 7 Cal.4th at p. 52; *Cross, supra,* 11 Cal.App.5th at pp. 325-326; *Medical Bd. of California v. Chiarottino* (2014) 225 Cal.App.4th 623, 631; *People v. Martinez* (2001) 88 Cal.App.4th 465, 474–475; *Lantz v. Superior Court* (1994) 28 Cal.App.4th 1839, 1853.)  As one court explained, "[t]he matters disclosed to the physician arise in most sensitive areas often difficult to reveal even to the doctor.  Their unauthorized disclosure can provoke more than just simple humiliation in a fragile personality. . . . The individual's right to privacy encompasses not only the state of his mind, but also his viscera, detailed complaints of physical ills, and their emotional

---

[6] In *Hill*, our Supreme Court distinguished informational privacy from "autonomy privacy":  "interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference."  (*Hill, supra*, 7 Cal.4th at p. 35.)

11

overtones.  The state of a person's gastro-intestinal tract is as much entitled to privacy from unauthorized public or bureaucratic snooping as is that person's bank account, the contents of his library or his membership in the NAACP." (*Board of Medical Quality Assurance v. Gherardini* (1979) 93 Cal.App.3d 669, 679.) Nor does the DCA dispute that Wolfsohn can assert his patients' privacy rights.  (See *Lewis*, *supra*, 3 Cal.5th at pp. 570–571; *Bearman v. Superior Court* (2004) 117 Cal.App.4th 463, 469.)

The right to privacy, however, is not absolute.  (*Hill*, *supra*, 7 Cal.4th at p. 37; *Fett v. Medical Bd. of California* (2016) 245 Cal.App.4th 211, 221 (*Fett*).)  Potential invasions of privacy are ordinarily evaluated by balancing the privacy interest at stake and the seriousness of the threatened invasion with the strength of legitimate and important countervailing interests.  (*Hill*, *supra*, 7 Cal.4th at p. 37; *Williams, supra,* 3 Cal.5th at p. 552.)  In balancing these interests, courts should also consider whether " '[p]rotective measures, safeguards[,] and other alternatives may minimize the privacy intrusion.' " (*Lewis, supra,* 3 Cal.5th at p. 576.)

Medical patients' privacy interest, our Supreme Court has observed, derives from their expectation of privacy in their physician's files, which "may include descriptions of symptoms, family history, diagnoses, test results, and other intimate details concerning treatment." (*Lewis*, *supra*, 3 Cal.5th at p. 575.) Although the patient's privacy interest is "robust" (*ibid.*), it must be balanced against the state's legitimate and important countervailing interest "in ensuring that the public receives medical care that conforms with the standard of care." (*Fett*, *supra*, 245 Cal.App.4th at p. 221, fn. 2.)  Although the courts should also, as the DCA points out, take into consideration the protections in place to prevent public disclosure of subpoenaed records (see,

12

e.g., Bus. & Prof. Code, § 2225, subd. (a), Gov. Code, § 11183), our Supreme Court has observed that "adequate protections against public disclosure do not obviate constitutional concerns as privacy interests are still implicated when the government accesses personal information without disseminating it." (*Lewis*, *supra*, 3 Cal.5th at p. 577.)

Courts have applied the *Hill* framework to cases involving the Medical Board's access to a patient's medical records by allowing the Medical Board to review such records when it establishes "good cause" for the examination. (See, e.g., *Grafilo v. Cohanshohet* (2019) 32 Cal.App.5th 428, 437 (*Cohanshohet*)); *Fett*, *supra*, 245 Cal.App.4th at pp. 224–225; see also *Lewis*, *supra*, 3 Cal.5th at p. 575 [recognizing that Courts of Appeal use good cause test for evaluating Medical Board's subpoenas for patient medical records].) As one court explained: " 'When the Medical Board seeks judicial enforcement of a subpoena for a physician's medical records, it cannot delve into an area of reasonably expected privacy simply because it wants assurance the law is not violated or a doctor is not negligent in treatment of his or her patient. [Citation.] Instead, the Medical Board must demonstrate through competent evidence that the particular records it seeks are relevant and material to its inquiry sufficient for a trial court to independently make a finding of good cause to order the materials disclosed.' " (*Kirchmeyer v. Phillips* (2016) 245 Cal.App.4th 1394, 1402, quoting *Bearman v. Superior Court*, *supra*, 117 Cal.App.4th at pp. 468-469.)

We review the court's conclusion that the DCA established good cause to support the subpoena under the substantial evidence standard. (*Fett*, *supra*, 245 Cal.App.4th at p. 216.) The question whether the subpoena meets the constitutional standards for

13

enforcement is a question of law which we review de novo. (*Cohanshohet*, *supra*, 32 Cal.App.5th at p. 436.)

In *Cohanshohet*, *supra*, 32 Cal.App.5th 428, Division 8 of this court recently held that a subpoena for a physician's patient's medical records lacked good cause under circumstances similar to the circumstances in this case.[7]  In *Cohanshohet*, as here, the DCA issued subpoenas—based upon Naqvi's opinions—for the patient records of a physician specializing in pain management.  (*Id.* at p. 431.)  It appears from the *Cohanshohet* opinion that Naqvi's declaration in that case was substantially similar to the declaration he provided in the instant case, with the exception of the prescription information regarding particular patients.

The *Cohanshohet* court concluded that the Medical Board failed to demonstrate good cause.  (*Cohanshohet*, *supra*, 32 Cal.App.5th at p. 440.)  The court explained:  "[T]here are no facts suggesting Dr. Cohanshohet was negligent in treating his patients or that he prescribed controlled substances without meeting the standard of care.  Given that Dr. Cohanshohet is a pain management specialist who sometimes treats patients seeking active cancer treatment, palliative care, and end-of-life care, it is reasonable to assume at least some of his patients would require treatment for pain that would exceed the recommended dose. Indeed, there is no indication how many patients Dr. Cohanshohet treats in total and what percentage the five patients at issue comprise that total."  (*Id.* at p. 440.)  Moreover, the Medical Board "made no evidentiary showing of how often similarly situated

---

**7** *Cohanshohet* was decided after the parties filed their briefs in this case.  We requested the parties submit supplemental briefs addressing the application of *Cohanshohet* to the issues in this case. We have received and considered the briefs.

14

physicians who specialize in pain treatment might prescribe these drugs.  Neither has the [Medical] Board made any showing of the likelihood that the prescriptions could have been properly issued, given what is known of Dr. Cohanshohet's practice." (*Ibid*.)

The *Cohanshohet* court, we believe, appropriately balanced the competing privacy and state interests concerning access to patient medical records by requiring that the Medical Board make a sufficient evidentiary showing that the subpoenaed physician has been issuing prescriptions in violation of law or the particular applicable standard of care.  In *Cohanshohet*, the evidence was insufficient because Naqvi's declaration lacked information regarding the number of patients the physician treated during the relevant period, how other similarly-situated physicians might lawfully prescribe the drugs in question, and the likelihood that the suspect prescriptions could have been properly issued.

*Cohanshohet* does not suggest, nor do we, that the evidence absent in that case, or ours, must be present in other cases, or that courts should not consider the presence or absence of other facts bearing upon the patients' privacy interests, the state's interest, and protective measures and alternatives.  In *Cross*, *supra*, 11 Cal.App.5th 305, for example, in addition to evidence regarding the physician's suspicious prescribing activity, the Medical Board supported its subpoena with evidence that (1) one person for whom the physician prescribed controlled substances told an investigator that the physician had not treated her at all, and (2) the physician had been subject to discipline for improperly prescribing sleep medication in another state.  (*Id*. at p. 328.)  Evidence that a physician's patient has been harmed as a result of prescriptions issued by the physician would also weigh heavily in the state's favor in seeking patient medical files.

The defects in the evidence supporting the subpoenas in *Cohanshohet* are present here and there are no additional facts that add substantial weight in favor of the subpoena. The DCA offered no evidence as to how many patients Wolfsohn treats, the percentage of his patients the five patients comprised, how often similarly-situated pain management specialists might prescribe the drugs Wolfsohn prescribed, or the likelihood Wolfsohn properly issued the prescriptions. Indeed, the DCA did not offer any evidence to contradict Helm's statement that Wolfsohn's prescriptions are "not outside of acceptable" levels for a pain management specialist.

The DCA argues that the instant case is distinguishable from *Cohanshohet* because "the prescribing dosages of opiates in this case are much higher than those examined in *Cohanshohet*." Even if we assume that Naqvi's statements regarding Wolfsohn's prescriptions are admissible, the statements regarding the dosages do not cure the defects we have identified.

The DCA also asserts that the physician in *Cohanshohet* "claimed to practice end-of-life medicine" that may have justified the prescriptions. The fact that Wolfsohn did not state that he deals with end-of-life patients is immaterial. Wolfsohn is a pain management specialist who treats "patients with severe pain or chronic intractable pain." He defined intractable pain as pain that "will not go away" and about which "conservative measures" of treatment have failed. As with Dr. Cohanshohet, "it is reasonable to assume at least some of his patients would require treatment for pain that would exceed the recommended dose." (*Cohanshohet*, *supra*, 32 Cal.App.5th at p. 440.)

The DCA also asserts that the *Cohanshohet* court "found it significant to its good cause evaluation that the triggering complaint leading to the investigation was anonymous." Even if we

16

agreed that the *Cohanshohet* court considered that fact significant, it is not a basis for a different result in this case. Here, investigator Tu stated that the DCA began its investigation after receiving "a complaint" from a named officer with the "Ventura County Interagency Pharmaceutical Crimes Unit." No information was provided regarding the nature of the complaint or the basis upon which the officer made the complaint. Thus, although the complainant is not anonymous, his identification adds nothing to the good cause determination.

Accordingly, we reverse the court's order.[8]

## DISPOSITION

The court's December 13, 2017 order granting the DCA's petition to compel Wolfsohn to comply with its subpoena is reversed.

Wolfsohn is awarded his costs on appeal.

<u>CERTIFIED FOR PUBLICATION</u>.

ROTHSCHILD, P. J.

We concur.

JOHNSON, J.

---

[8] We express no view on the merits of Wolfsohn's remaining arguments. Our conclusion does not preclude the DCA from issuing or enforcing subpoenas that are supported by good cause and otherwise lawful.

17

WEINGART, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.