Filed 6/29/26  Lally v. Nuccion CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CHRISTINE LALLY, as Acting Director, etc., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> STEPHEN LOUIS NUCCION, <br><br> Defendant and Appellant; <br><br> PATIENT 1, <br><br> Real Party in Interest and Appellant. | B342305 <br><br> (Los Angeles County Super. Ct. No. 24STCP01901) |

APPEAL from an order of the Superior Court of Los Angeles County, Teresa A. Beaudet, Judge.  Reversed.

Schafer McMahon, Raymond J. McMahon and Mary Chen for Defendant and Appellant.

Rob Bonta, Attorney General, Gloria L. Castro, Assistant Attorney General, Edward K. Kim and Christina Sein Goot, Deputy Attorneys General, for Plaintiff and Respondent.

Bonne, Bridges, Mueller, O'Keefe & Nichols, Derek Felton O'Reilly-Jones and Nicholas Archibald for Real Party in Interest and Appellant.

_____

This is an appeal from the trial court's enforcement of the Medical Board of California's (the Board's) subpoena to appellant Dr. Stephen Louis Nuccion to produce real party in interest and appellant Patient 1's confidential medical records. The appellants are family members. Dr. Nuccion treated Patient 1 with two controlled substances—phentermine and clonazepam— over a six-year period. It is undisputed other physicians prescribed the same two controlled substances for Patient 1 before and after Dr. Nuccion's treatment of Patient 1. The Board, an administrative agency within the Department of Consumer Affairs (respondent), issued an expansive subpoena for Patient 1's medical record. The trial court found good cause to order production of Patient 1's medical records. Appellants challenge that finding for want of substantial evidence. We agree that no substantial evidence supported the trial court's finding of good cause to produce the confidential patient records requested by the Board and reverse.

## BACKGROUND

According to the Board, it received a complaint from an unidentified person that Dr. Nuccion was prescribing controlled substances to a family member. The Board "obtained the Controlled Substance Utilization Review and Evaluation System

2

('CURES')[1] report" for Patient 1 from June 10, 2015 through June 10, 2022, which indicated that Dr. Nuccion prescribed phentermine and clonazepam to Patient 1.

In January 2023, the Board issued an investigational subpoena duces tecum to produce Patient 1's papers and documents. The subpoena requested the following records for the June 10, 2015 through January 2023 time period:

"1. [A]ll medical histories, treatment notes and records, physical examinations, test results, orders, prescription records, operative reports, consultation records, nursing notes;

"2. all x-ray films and reports, MRIs and reports, CT scans and reports; and any other imaging scans and reports;

"3. all pathology reports and laboratory data;

"4. all correspondence, consents, electronic communications, memorandums, releases, and telephone messages;

"5. all doctor-patient agreements, contracts, and other records of agreements with the patient, created or in effect between the specified dates above. This request includes records that may have been created at any time, including before the specified period, but that relate to the services provided during the time period;

---

[1] According to the Board, "CURES is a database of Schedule II, Schedule III, Schedule IV and Schedule V controlled substance prescriptions dispensed in California . . . ." In the declaration of the Board's consultant, Dr. Erich W. Pollak, he stated, "Law enforcement and regulatory agencies use the data to assist in their efforts to control the diversion and resultant abuse of controlled substances."

"6. all Patient Activity Reports (PARs) and Controlled Substance Utilization Review and Evaluation System (CURES) reports;

"7. all data, information or records concerning all prescriptions for the patient;

"8. all billing records;

"9. all other data, information or record which would reveal all medical care provided to the above-named patient."

## 1. *Petition for order to show cause and order compelling compliance with investigational subpoena*

Dr. Nuccion, an orthopedic surgeon, did not produce the requested records, and the Board sought court intervention to compel their production. The Board represented it needed Patient 1's medical records to determine if there has been a violation of the Medical Practice Act, but did not specify any potential violation of the Medical Practice Act.[2] In its petition, the Board relied exclusively on Dr. Pollak's declaration to argue good cause to compel compliance with the investigational subpoena. According to the Board, Dr. Pollak opined Dr. Nuccion prescribed phentermine and clonazepam beyond the "recommended time period" and also opined that orthopedic surgeons do not generally prescribe those medications.[3]

___

[2] The Medical Practice Act is codified in Business and Professions Code section 2000 et seq.

[3] We do not agree with Patient 1 that Dr. Pollak was not qualified to provide an expert medical opinion because he was not an orthopedic surgeon. (*Fett v. Medical Bd. of California* (2016) 245 Cal.App.4th 211, 222 ["It is not critical whether a medical expert is a specialist."].)

4

In his declaration in support of the petition for order compelling compliance with the investigational subpoena, Dr. Pollak averred that he is a licensed physician and surgeon with more than 53 years of experience. Dr. Pollak reviewed the CURES database maintained by the California Department of Justice to monitor the prescribing and dispensing of controlled substances. Dr. Pollak learned from that database Dr. Nuccion prescribed to a family member the controlled substances phentermine (an "oral sympathomimetic amine, pharmacologically similar to amphetamines") and clonazepam (a benzodiazepine) over several years. The prescribing of controlled substances to a family member "may" have violated a provision in the Medical Practice Act he does not identify.

Dr. Pollak further averred, the "standard of care for a physician repetitively prescribing addicting controlled substances includes, but is not limited to, keeping adequate and complete medical records, documenting a pertinent history and appropriate physical examination prior to initiating treatment with controlled substances, documentation of relevant tests which support the diagnosis and the prescription of controlled substances, and documentation of reasons justifying why controlled substances were chosen instead of other treatment modalities. The standard of care also requires documentation of a treatment plan and informed consent, and having a treatment plan in place which includes a clause establishing that controlled medications will only be for the personal use of the patient, obtained only from one medical office, and will be dispensed by only one pharmacy, and that noncompliance with these restrictions will not be tolerated."

Dr. Pollak then elaborated on his definition of the standard of care: "The standard of care is to refuse to prescribe a controlled substance in the absence of a legitimate medical reason for the prescription. This includes the prescription of a controlled substance when the prescriber knows or reasonably believes that the recipient of the prescription will use the controlled substance for nonmedical purposes, such as recreational use or sale to a third party. A prescriber of controlled substances is expected to take reasonable precautions to prevent diversion of these controlled substances for nonmedical use. . . . The standard of care also includes exercising reasonable diligence to distinguish a truly afflicted patient from an addict who wants a drug to satisfy his or her addiction, or a person who intends to resell the drug in [a] clandestine fashion. The standard of care is to decline to prescribe narcotics to an addict just to satisfy his or her addiction. Finally, controlled substances should only be prescribed for a good medical reason. Prior to such a prescription, an appropriate evaluation of the patient has to be documented in records, including at least a pertinent history and an appropriate physical examination."

Dr. Pollak stated that Dr. Nuccion "may be prescribing in an unprofessional manner, including possible diversion of these drugs for inappropriate uses, including the possible self-use of the prescribed medications and the possibility that the prescribed medications are not for a legitimate medical reason and are not supported by documentation justifying the prescriptions."

Dr. Pollak concluded, "[T]here is good cause to believe that Dr. Nuccion was practicing medicine outside the standard of care when he repetitively prescribed phentermine and clonazepam to Patient 1 over a six-year period. Based on the fact that Patient 1

6

is Dr. Nuccion's family member . . . and the fact that Dr. Nuccion is an orthopedic surgeon whose area of specialization does not typically involve the prescription of the controlled substances at issue, there is good cause to believe that the prescribed medications are not for a legitimate medical reason and are not supported by documentation justifying the prescriptions.  In order to opine on the issues enumerated above and to determine whether or not a violation of the Medical Practice Act has occurred, it is necessary to obtain and review Dr. Nuccion's certified medical records for Patient 1 for the period of June 10, 2015 to the present."

**2.** ***Dr. Nuccion opposed the Board's petition to compel compliance with the investigative subpoena***

Dr. Nuccion argued in opposition to the petition that Dr. Pollak's declaration did not justify invading Patient 1's privacy rights.  Dr. Nuccion also argued the subpoena seeking records from 2015 to the present was overbroad.

Dr. Daniel F. Chueh, a psychiatrist, provided a declaration in support of Dr. Nuccion's opposition.  Dr. Chueh averred orthopedic surgeons are familiar with phentermine and clonazepam as part of their specialization.  Dr. Chueh also stated phentermine is safe for long-term use, and that studies showed the risk of long term benzodiazepines (including clonazepam) were overstated.

Dr. Nuccion also provided a declaration.  He represented, "The use of benzodiazepines has become a routine part of my practice for more than two decades."  According to Dr. Nuccion, between 2 and 7.5 percent of the population use benzodiazepine long term.  He also averred longer use of phentermine is a common practice to "help patients achieve a more ideal body

7

weight and for the medical treatment of obesity" and the risks of long term use of phentermine were lower than the risk of obesity. He opined achieving such an ideal weight is "one of the easiest ways to manage musculoskeletal complaints." Dr. Nuccion also stated he does not take any controlled substances and has never taken medication prescribed to another person.

### 3. *Patient 1 intervenes and opposes the Board's petition*

The trial court permitted Patient 1 to intervene to assert privacy rights to confidential medical records and oppose the petition. In a declaration, Patient 1 stated Dr. Nuccion provided care when Patient 1 was searching for new providers. Patient 1 added Dr. Nuccion did not initiate Patient 1's phentermine or clonazepam prescriptions and current providers have continued those prescriptions. Patient 1 also stated, "I have suffered no adverse side effects or negative consequences from the medications I have been prescribed and I am neither dependent upon nor addicted to either clonazepam or phentermine." Patient 1 expressed satisfaction with Dr. Nuccion's care. She claimed the phentermine and clonazepam Dr. Nuccion and other physicians had prescribed were "essential to my being able to complete the ordinary activities of daily living."

Patient 1 also provided the declaration of Dr. Marvin Firestone, a psychiatrist. Dr. Firestone opined orthopedic surgeons routinely prescribe phentermine and clonazepam in practicing their specialty. Dr. Firestone stated, "[T]here is no law or regulation that prohibits physicians from prescribing to family members. In fact, research has demonstrated that approximately 84% of physicians have or will at some point in their careers treat a family member." Dr. Firestone acknowledged, "generally," phentermine is not "recommended for long term use for the

8

treatment of obesity." He, however, added recommendations are not "prohibitions" and "[e]very clinical situation is different and requires individualized, case-by case analysis by a physician." Dr. Firestone also stated Schedule IV drugs,[4] including phentermine and clonazepam, have a low potential for abuse and risk of dependence.

4. ***Reply***

In response to Patient 1's opposition, the Board argued Dr. Pollak's declaration provided good cause for subpoenaing Patient 1's medical records and the Board's interest in ensuring that Dr. Nuccion's conduct conforms to the standard of care outweighs Patient 1's privacy concerns. The Board disputed that it was common practice to treat a family member and in support, cited the American Medical Association (AMA) Code of Medical Ethics, which according to the Board, counsels against treating family members. The trial court, however, denied the Board's request for judicial notice of the AMA Code of Medical Ethics.[5]

In response to Dr. Nuccion's opposition, the Board emphasized that orthopedic surgery does not involve the prescription of phentermine or clonazepam. The Board contended Dr. Chueh's declaration was not persuasive because he is a psychiatrist. According to the Board: "Psychiatry is a branch of medicine that focuses on the diagnosis, treatment and prevention of mental, emotional and behavioral disorders, which

---

[4] See Health and Safety Code section 11057, which lists Schedule IV substances.

[5] By order dated March 13, 2026, this court took judicial notice of the AMA Code of Medical Ethics Opinion 1.2.1 "Treating Self or Family."

9

is very different than the practice of orthopedic surgery, which focuses on treating, diagnosing, and preventing conditions that affect your bones, muscles and joints." (Fn. omitted.)

## 5. *Trial court order*

Based on Dr. Pollak's declaration, the trial found "good cause to review the requested records." Citing *Kirchmeyer v. Helios Psychiatry Inc.* (2023) 89 Cal.App.5th 352 (*Helios)*, the trial court stated the Board is not required to provide wrongdoing, but only to provide evidence supporting the inference that Dr. Nuccion departed from the standard of care. The court ordered Dr. Nuccion to produce the following documents for the June 10, 2015 through January 26, 2023 time period:

"1. [A]ll medical histories, treatment notes and records, physical examinations, test results, orders, prescription records, operative reports, consultation records, nursing notes;

"2. all x-ray films and reports, MRIs and reports, CT scans and reports; and any other imaging scans and reports;

"3. all pathology reports and laboratory data;

"4. all correspondence, consents, electronic communications, memorandums, releases, and telephone messages;

"5. all doctor-patient agreements, contracts, and other records of agreements with the patient, created or in effect between the specified dates above [June 10, 2015 through the present]. This request includes records that may have been created at any time, including before the specified period, but that relate to the services provided during the time period;

"6.  all Patient Activity Reports (PARs)and Controlled Substance Utilization Review and Evaluation System (CURES) reports;

"7.  all data, information or records concerning all prescriptions for the patient;

"8.  all billing records;

"9.  all other data, information or record[s] which would reveal all medical care provided to the above-named patient." The court found these records " 'relevant and material' " to the Board's inquiry.

Dr. Nuccion and Patient 1 appealed and petitioned for a writ of supersedeas (in case No. B342305) to stay the trial court's order pending the resolution of this appeal.  We issued a stay pending this appeal.

## DISCUSSION

A physician may prescribe controlled substances only when the physician "holds a good faith belief that it is required for a patient's ailment, and only in a quantity and for a length of time that is reasonably necessary."  (*Grafilo v. Cohanshohet* (2019) 32 Cal.App.5th 428, 435.)  The Board may impose disciplinary action if a physician violates these principles.  (*Id*. at p. 435.)  The Board may issue a subpoena for investigative purpose, and if a physician refuses to comply, the Board may petition the superior court for an order compelling compliance.  (*Ibid*.)

The Board's right to information must be balanced against a patient's right to privacy of his or her medical records.  (*Grafilo v. Soorani* (2019) 41 Cal.App.5th 497, 507; *Grafilo v. Wolfsohn* (2019) 33 Cal.App.5th 1024, 1032.)  "Medical patients' privacy interest, our Supreme Court has observed, derives from their expectation of privacy in their physician's files, which 'may

11

include descriptions of symptoms, family history, diagnoses, test results, and other intimate details concerning treatment.' [Citation.] Although the patient's privacy interest is 'robust' [citation], it must be balanced against the state's legitimate and important countervailing interest 'in ensuring that the public receives medical care that conforms with the standard of care.' [Citation.]" (*Grafilo v. Wolfsohn*, *supra*, 33 Cal.App.5th at pp. 1034–1035.)

This balance tilts in favor of the Board when the Board shows " 'through competent evidence that the particular records it seeks are relevant and material to its inquiry sufficient for a trial court to independently make a finding of good cause . . . . [Citations.]' [Citation.]" (*Grafilo v. Soorani*, *supra*, 41 Cal.App.5th at pp. 508–509.) " 'When the Medical Board seeks judicial enforcement of a subpoena for a physician's medical records, it cannot delve into an area of reasonably expected privacy simply because it wants assurance the law is not violated or a doctor is not negligent in treatment of his or her patient. [Citation.] Instead, the Medical Board must demonstrate through competent evidence that the particular records it seeks are relevant and material to its inquiry sufficient for a trial court to independently make a finding of good cause to order the materials disclosed. [Citations.] . . . .' [Citation.]" (*Kirchmeyer v. Phillips* (2016) 245 Cal.App.4th 1394, 1402.)

"When petitioning to compel compliance with an investigative subpoena, the Board's burden is not to prove wrongdoing, but rather to provide evidence supporting an inference the physician departed from the standard of care." (*Helios*, *supra*, 89 Cal.App.5th at p. 362; see also *Wood v. Superior Court* (1985) 166 Cal.App.3d 1138, 1150 (*Wood*) [The

12

Board is not required to show wrongdoing but to put forth evidence to support its "inference of improper prescribing"].)**6**

We review for substantial evidence, the trial court's finding of good cause. (*Grafilo v. Wolfsohn*, *supra*, 33 Cal.App.5th at p. 1035.) The parties dispute whether substantial evidence supports the trial court's conclusion that the Board proffered evidence supporting the inference that Dr. Nuccion departed from the standard of care by prescribing clonazepam and phentermine to Patient 1 over a six-year period. We conclude the Board did not provide evidence supporting such an inference of departure from the standard of care defined by the Board's expert. (*Helios*, *supra*, 89 Cal.App.5th at p. 362 [Board's burden is to "provide evidence supporting an inference the physician departed from the standard of care"].)

Two cases feature prominently in the parties' briefing. Dr. Nuccion and Patient 1 rely on this Division's *Grafilo v. Wolfsohn*, *supra*, 33 Cal.App.5th 1024 and the Board relies on *Helios*, *supra*, 89 Cal.App.5th 352. We turn to those cases now.

### A.     *Grafilo v. Wolfsohn*, *supra*, 33 Cal.App.5th 1024

In *Grafilo*, we held the Board did not establish good cause to compel a doctor specializing in pain management to produce the medical records of five of his patients. (*Grafilo v. Wolfsohn*,

---

**6** The California Supreme Court disapproved *Wood*, *supra*, 166 Cal.App.3d 1138, to the extent *Wood* "require[s] a party seeking discovery of private information to always establish a compelling interest or compelling need." (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 557 & fn. 8.) *Wood* was not overruled on any other ground and thus, it is still authoritative for, inter alia, its "good cause analysis." (*Grafilo v. Cohanshohet*, *supra*, 32 Cal.App.5th at p. 437, fn. 2.)

*supra*, 33 Cal.App.5th at p. 1027.)  Law enforcement reported to the Board that the doctor may have been overprescribing controlled substances.  This complaint precipitated the Board's investigation.  (*Ibid*.)  A medical consultant for the Board opined that the doctor " 'prescribed controlled substances in a manner that appeared to be inconsistent with the standard of care for prescribing those drugs' " and the patients' records were necessary to determine if Dr. Wolfsohn " 'properly and safely administered' " the controlled substances.  (*Id*. at p. 1028.)  The medical consultant noted the amount of each prescribed drug and the frequency of the " 'prescriptions fulfilled' " for each patient and concluded the " 'prescription patterns . . . appear to represent concerning departures from the standard of care for prescribing these controlled substances.' "  (*Id*. at p. 1030.)  The consultant did not opine that this data indicated a breach of the standard of care or violation of the Medical Practice Act.  Instead, he opined the patients' medical records were necessary to ensure the doctor conducted an " 'appropriate examination or screening' " and applied " 'appropriate monitoring' " to prevent placing his patients at undue risk.  (*Ibid*.)

In opposition, the doctor's expert stated in his declaration that there was no reason to believe the doctor acted outside the standard of care and the desire to review the patients' medical records . . . is " 'speculative curiosity, not a good cause belief to pry into confidential patient files and care.' "  (*Grafilo v. Wolfshon*, *supra*, 33 Cal.App.5th at p. 1031.)

In concluding no substantial evidence supported the trial court's finding of good cause, we explained:  " ' "When the Medical Board seeks judicial enforcement of a subpoena for a physician's medical records, it cannot delve into an area of reasonably

14

expected privacy simply because it wants assurance the law is not violated or a doctor is not negligent in treatment of his or her patient.  [Citation.]  Instead, the Medical Board must demonstrate through competent evidence that the particular records it seeks are relevant and material to its inquiry sufficient for a trial court to independently make a finding of good cause to order the materials disclosed." ' [Citation.]" (*Grafilo v. Wolfshon*, *supra*, 33 Cal.App.5th at p. 1035.)  The Medical Board must "make a sufficient evidentiary showing that the subpoenaed physician has been issuing prescriptions in violation of law or the particular applicable standard of care." (*Id*. at p. 1036.)

We concluded the Board had not meet its burden to show good cause because it "offered no evidence as to how many patients Wolfsohn treats, the percentage of his patients the five patients comprised, how often similarly situated pain management specialists might prescribe the drugs Wolfsohn prescribed, or the likelihood Wolfsohn properly issued the prescriptions." (*Grafilo v. Wolfshon, supra*, 33 Cal.App.5th at p. 1037.)  The Board also did not contradict Dr. Wolfsohn's expert, who opined that Wolfsohn's prescriptions are " 'not outside of acceptable' levels for a pain management specialist." (*Ibid*.)

In our opinion, we relied on *Grafilo v. Cohanshohet, supra*, 32 Cal.App.5th 428.  In *Cohanshohet*, Division Eight of this District held the declaration of the Board's expert did not support good cause for disclosure of patient medical records.  The Board's investigation started when an anonymous person complained the doctor, a pain management specialist, overprescribed opioids for one patient without conducting an examination or screening of the patient.  (*Id*. at p. 431.)  The Board's expert, the same expert

15

who appeared for the Board in *Grafilo,* "identified five patients who were prescribed controlled substances in a manner that appeared to deviate from the standard of care for prescribing these drugs." (*Id.* at p. 432.) The Board's expert opined the patients' medical records were necessary to determine whether the doctor "performed an examination and screening of those patients, received informed consent, regularly assessed the efficacy and effects of the treatment regimen, and monitored these patients." (*Id.* at p. 433.)

The appellate court held an expert merely opining that confidential medical records are needed to determine whether a physician performed an adequate examination and screening and regularly assessed the patient is insufficient to show good cause to produce patients' records. (*Grafilo v. Cohanshohet*, *supra*, 32 Cal.App.5th at p. 435.) The court added, there were "no facts suggesting Dr. Cohanshohet was negligent in treating his patients or that he prescribed controlled substances without meeting the standard of care." (*Id.* at p. 440.)

## B.  *Helios*, *supra*, 89 Cal.App.5th 352

In *Helios*, the appellate court affirmed the implied finding that the Board showed good cause to obtain medical records of a family member for whom the subject psychiatrist prescribed controlled substances. (*Helios*, *supra*, 89 Cal.App.5th at p. 356.) The Board investigation commenced after a patient filed a complaint alleging the psychiatrist inappropriately prescribed controlled substances and violated professional boundaries. (*Ibid*.) During its investigation, the Board found that the doctor prescribed Adderall and Klonopin to a family member and the Board "deemed it necessary to obtain the family member's

16

medical records to evaluate whether the prescriptions were 'medically appropriate and within the standard of care.' " (*Ibid.*)

To support good cause, the Board relied on its expert, Dr. Laura Davies, also a psychiatrist. She cited an ethics opinion that "counseled physicians against treating family members except in emergencies." (*Helios*, *supra*, 89 Cal.App.5th at p. 357.) She observed this admonishment not to treat family members except in emergencies "applied 'with particular emphasis' to psychiatrists as they are required to maintain appropriate boundaries with patients and should not serve in multiple roles." (*Ibid.*) "According to Dr. Davies, it is 'well understood among psychiatrists, and is part of the training in psychiatry, that treating family members is outside the standard of care. And prescribing controlled substances is in virtually all circumstances, far outside the standard of care.' " (*Ibid.*) Dr. Davies added that the family member at issue there had no prior prescription for the controlled substances. (*Ibid.*) Dr. Davies concluded the medical records would be necessary to assess the reason the doctor prescribed medication to a family member and whether the doctor properly documented the family member's treatment. (*Ibid.*)

The appellate court concluded substantial evidence supported good cause requiring disclosure of the medical records. (*Helios*, *supra*, 89 Cal.App.5th at p. 360.) The appellate court reiterated that the Board's burden was not to prove wrongdoing, but instead, to proffer evidence "supporting an inference the physician departed from the standard of care." (*Id.* at p. 362.) The appellate court concluded the Board's expert opinion supported such an inference. As noted above, Dr. Davies opined that treating a family member was "outside the standard of care"

and prescribing controlled substances was "far outside the standard of care." (*Id.* at p. 361, italics omitted.) The expert also opined it was "highly improbable" an emergency justified the prescriptions for a family member given the availability of physicians in the Bay Area. (*Ibid.*) In ruling the Board had shown good cause, the appellate court observed that the subpoena was limited in scope—"it sought documents and information supporting [the doctor's] rationale for prescribing the controlled substances to her family member between January 2019 and September 2020." (*Ibid.*)

**C.    The Board Here Did Not Provide Any Evidence From Which To Infer Dr. Nuccion Breached the Standard of Care**

Dr. Pollak's declaration does not constitute substantial evidence from which to infer that Dr. Nuccion acted outside the standard of care he identifies in his declaration. Dr. Pollak stated in his declaration that the standard of care requires keeping adequate records and documentation and that controlled substances be used only by the patient. Dr. Pollak also described the standard of care as refusing to prescribe a controlled substance absent a legitimate medical reason. In contrast to the Board's expert in *Helio*s, Dr. Pollak did not describe the standard of care as prohibiting an orthopedic surgeon from prescribing controlled substances to a family member.

Here, there was no evidence from which to infer that Dr. Nuccion failed to keep adequate records or documentation of his prescriptions to Patient 1 or that there was no legitimate reason for prescribing the medications to Patient 1, especially given, again in contrast to *Helios*, that it was undisputed other physicians had prescribed the same medications to Patient 1 in

18

the past and subsequent to Dr. Nuccion's prescriptions for Patient 1. Dr. Pollak's statement that Dr. Nuccion may himself be using the controlled substances is untethered to evidence and constitutes mere speculation. The Board did not describe Patient 1's CURES report as showing any change in Patient 1's prescriptions. This is significant because a change in prescriptions potentially might suggest the prescriptions were being used by someone other than Patient 1. As noted in *Grafilo*, merely identifying a need to review records to determine whether a physician performed an adequate examination and properly documented a patient's care, without more, does not support good cause for disclosure of confidential patient medical records. (*Grafilo v. Cohanshohet*, *supra*, 32 Cal.App.5th at p. 440.)

Respondent argues, "The very essence of the potential violation lies in the fact that Dr. Nuccion repeatedly prescribed to his family member over several years for drugs normally prescribed on a short-term basis." Respondent appears to assume that it is a breach of the standard of care to prescribe a drug for more than the purported "normal" time-period a prescription is prescribed. This assumption is not supported by Dr. Pollak's declaration. Dr. Pollak stated use of phentermine and clonazepam beyond the "useful recommended time period" increases the possibility of drug addiction. Dr. Pollak also stated, "The standard of care is to decline to prescribe *narcotics* to an addict just to satisfy his or her addiction." (Italics added.) The Board offered no evidence from which to infer Patient 1 had a drug addiction or even that the substances prescribed to Patient

19

1 are narcotics.[7]  While Dr. Pollak opined that phentermine "is not recommended for long-term use due to the lack of long-term benefits," he did not opine that proscribing phentermine for long term use was a breach of the standard of care.  Dr. Pollak also did not opine that prescribing the long-term use of clonazepam was a breach of the standard of care.[8]

Relying on the undisputed fact that Dr. Nuccion is an orthopedic surgeon, Dr. Pollak averred because orthopedic surgeons do not generally prescribe clonazepam or phentermine, there were concerns Dr. Nuccion may have prescribed the controlled substances for "possible self-use" or for an illegitimate reason.  Dr. Pollak, however, offers *no* evidence supporting the inference that Dr. Nuccion prescribed the medications for an improper purpose, including his own use, and it is undisputed that other physicians prescribed Patient 1 the same medications.

In addition to relying on Dr. Pollak's declaration, respondent relies on an ethics opinion by the AMA stating that, in general, a physician should not treat a family member except in an emergency or for a short term.  This ethics opinion was not in the record before the trial court and it is that record we review for substantial evidence.  Respondent cites no legal authority supporting that this court can consider new evidence when evaluating whether substantial evidence supports the trial

---

[7] Dr. Pollak averred that clonazepam is a benzodiazepine and phentermine was an "oral sympathomimetic amine, pharmacologically similar to amphetamines."  Dr. Pollak did not aver that either clonazepam or phentermine was a narcotic.

[8] In a footnote, Dr. Pollack described benzodiazepines and stated that "[i]n general" they are used "for a limited time period" but he did not describe that time period.

court's finding of good cause to order disclosure of patient records.[9] Dr. Pollak, moreover, did not opine that breach of an AMA ethics opinion is also a breach of the standard of care. Respondent proffered no evidence to support that the AMA's ethics opinion constitutes the standard of care.

In contrast, in *Helios*, the Board's request for documents was accompanied by an expert declaration that identified the relevant standard of care and provided evidence from which to infer a potential breach of that standard. To recap, the Board's expert averred, "[I]t is 'well understood among psychiatrists, and is part of the training in psychiatry, that treating family members is outside the standard of care. And prescribing controlled substances is in virtually all circumstances, far outside the standard of care.' " (*Helios*, *supra*, 89 Cal.App.5th at p. 357.) In this case, there was no similar evidence that an orthopedic surgeon's prescribing controlled substances to a family member is outside or far outside the standard of care of an orthopedic surgeon. The Board does not argue that the standard of care is the same for psychiatrists and orthopedic surgeons; it only asserts that psychiatry is "very different than the practice of orthopedic surgery . . . ."

---

[9] " 'It is a fundamental principle of appellate law that our review of the trial court's decision must be based on the evidence before the [trial] court at the time it rendered its decision. [Citations.]' [Citation.]" (*Grafilo v. Soorani*, *supra*, 41 Cal.App.5th at p. 512.) For that reason, we deny Patient 1's request for judicial notice of the California Department of Justice "CURES Prescribers, Pharmacists, Non-DEA Practitioners, and Delegates User Guide" as revised May 2026. This guide was not before the trial court when it rendered its decision ordering disclosure of Patient 1's medical records.

21

In further contrast, in *Helios*, the medical board sought only "documents and information supporting [the doctor's] rationale for prescribing the controlled substances to her family member between January 2019 and September 2020." (*Helios*, *supra*, 89 Cal.App.5th at p. 361.) Here, the Board's request was far reaching (see Background, *ante*) and substantially compromises Patient 1's privacy rights in medical records over a several-year period. (See *Wood*, *supra*, 166 Cal.App.3d at p. 1149 [Board must "demonstrate that the particular records it seeks are 'relevant and material to the board's inquiry' "].) The trial court's order was similarly broad. (See Background, part 5, *ante*.) In short, the trial court erred in finding good cause to support the Board's expansive request for Patient 1's medical records from 2015 through 2023.

Respondent argues Dr. Chueh and Dr. Firestone's declarations are not persuasive. We have not relied on those declarations because our standard of review requires us to consider the evidence in the light most favorable to the trial court's order. (*Grafilo v. Wolfsohn*, *supra*, 33 Cal.App.5th at p. 1035 [we review the trial court's good cause determination for substantial evidence].) Instead, we conclude the Board's own expert declaration does not demonstrate good cause. Additionally, we have relied on Patient 1's declaration only insofar as Patient 1 states other physicians prescribed phentermine and clonazepam, information also available on Patient 1's CURES report, which the Board indicated it accessed.[10]

---

[10] Respondent represents the Board reviewed the CURES prescription drug database prior to commencing its investigation.

22

Finally, we do not agree with respondent that "Patient 1 tendered her medical condition by becoming a party to this action and submitting a declaration . . . ." First, respondent does not show it raised this issue in the trial court and consequently, that the issue is even preserved for our review. On its merits, "[T]he tender doctrine, codified at Evidence Code sections 996 and 1016, 'compels disclosure only in cases in which the patient's own action initiates the exposure.' [Citation.]" (*Darab Cody N. v. Olivera* (2019) 31 Cal.App.5th 1134, 1141.) Here, Patient 1 intervened just to assert her "privacy rights," which are constitutionally protected. (*Helios*, *supra*, 89 Cal.App.5th at p. 360.) Additionally, the Board, not Patient 1, tendered the issue of Patient 1's medical condition by broadly requesting Patient 1's records from 2015-2023.

## DISPOSITION

The trial court's order requiring Dr. Stephen Louis Nuccion comply with the investigational subpoena is reversed. The trial court is directed to enter a new order denying the petition for compliance with the investigational subpoena. The parties shall bear their own costs on appeal. The stay entered in the related writ proceeding (case No. B342305) is dissolved.

NOT TO BE PUBLISHED.


BENDIX, J.

We concur:



ROTHSCHILD, P. J.          WEINGART, J.


23